# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| **MONTA ORLANDO JORDAN,** | )<br>) |
| Plaintiff, | ) Case No. 7:19CV00214<br>) |
| v. | ) **OPINION**<br>) |
| **JOSEPH FLIPPIN, ET AL.,** | ) By: James P. Jones<br>) United States District Judge |
| Defendants. | ) |

*Monta Orlando Jordan, Pro Se Plaintiff; Timothy R. Spencer,* ROANOKE CITY ATTORNEY'S OFFICE, *Roanoke, Virginia, for Defendant Flippin; Justin M. Lugar, Assistant United States Attorney, Roanoke, Virginia, for Defendants Sloan, Crowder, and United States of America.*

The plaintiff, Monta Orlando Jordan, a Virginia inmate proceeding pro se, brought this civil rights action pursuant to 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). The Complaint as amended alleges that the defendant law enforcement officers violated Jordan's Fourth Amendment rights by unlawfully entering his home without a search warrant and damaging, taking, or tampering with his property. The defendants have filed Motions to Dismiss, and Jordan has responded. After review of the record, I conclude that the defendants' motions must be granted.

I.

In late January of 2017, Jordan and his girlfriend, Amany Raya, returned to his residence in the City of Roanoke to find that the cable and internet service were not operating.[1] A Cox Cable representative Jordan called promised to send a service technician to address the problem on Monday, January 30, 2017. On that date, a white utility van parked across from Jordan's residence. Two white males in "utilitarian clothing" got out and used a mechanical lift to scale a telephone pole there. Compl. Ex. 1, Jordan Aff. ¶ 1, ECF No. 1-3. One man chatted with Jordan and said they had come to fix the cable and internet issues. Jordan alleges with no supporting evidence, "This installation was done without a search warrant. A pole camera had been installed." *Id.* At some point during the first two weeks of February 2017, Detective Joseph Flippin applied for and obtained authorization from a state magistrate to place GPS devices on Jordan's 2002 Chrysler, 2013 BMW, and 2016 Mercedes.

During the last week of February 2017, Jordan's landlord texted him to set a time for her brother to clean out the gutters of the residence Jordan was leasing from her. Jordan had not requested this maintenance. On March 3, 2017, after the gutter

---

[1] This summary of the sequence of events underlying Jordan's claims is taken from his pleadings. The facts in his submissions I consider as true for purposes of the Motions to Dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Jordan's speculative and conclusory assertions about these events, however, are not factual matter and, thus, are not included in this summary, except where noted as allegations only. *Id.*

cleaning was rescheduled once, a tall, bald, white man arrived and said he was there to clean the gutters, although he had no tools. Jordan walked him through the residence, left him on the back patio, and then went inside for a few minutes. As Jordan headed back to the patio, he saw the bald man in the dining room, looking into the kitchen. The man told Jordan that he had checked the gutters and "there was nothing to clean." *Id.* at ¶ 3. The man did not check the front gutters. At a court hearing months later, Jordan saw a bald man that he believed to be the man who checked the gutters. Jordan learned that the man was a task force officer for the Drug Enforcement Agency ("DEA") named Ryan Sloan. On March 5, 2017, Sloan obtained a federal warrant authorizing a trap and trace device to be placed on Jordan's cell phone. Compl. 3, ECF No. 1.

On the morning of March 6, 2017, shortly after Jordan's girlfriend left his residence in the Mercedes, she called to tell him that a man was sitting in a strange truck outside. Jordan looked out and saw the man in a dark-colored pickup truck, parked across the street. He assumed a man was conducting surveillance for law enforcement and later learned that the man in the truck was Roanoke City Police Detective Joseph Flippin.

Jordan left the residence around 11:00 a.m. and drove away in the Chrysler, leaving the BMW in the driveway near the rear basement door. When he returned to the residence around 12:15 p.m., he noticed that both upstairs bedrooms had been

ransacked. Jordan Aff. ¶ 4, ECF No. 1-3. Based on his earlier observation of the man in the pickup, Jordan "concluded that law enforcement had searched [his] residence," but he did not find a search warrant. *Id.* He discovered that the back door to the basement had been "kicked in and also had a hole in the basement door window," and the basement area had been ransacked. *Id.* Using his cell phone, Jordan took pictures of the damage.

In a closet in one of the upstairs bedrooms, Jordan had placed a black backpack that contained personal documents — his passport, Amany's passport, some documents from his past criminal proceedings, and Amany's "medical documents and dual citizenship litigation documents between her and the Egyptian Embassy. All of these documents were organized in a specific sequence." *Id.* After finding the basement door breached, Jordan noticed that someone had removed and then replaced the documents in the backpack in a different sequence. He also found that all of his clothing had been removed from the closet and "methodically placed on the floor in a[n] organized manner indicative of the perpetrators being in no rush searching the home, knowing exactly when the home was vacant, where [he] was at all times and when [he] was returning home." *Id.* He found no evidence that the living room had been searched. He discovered that the perpetrators had taken $15,000 in cash from his bedroom closet and two Bulova men's watches from his nightstand, each worth $700. Jordan did not report the March 6, 2017, burglary to

the police because of his "suspicion that law enforcement was responsible for the breakin (sic)." Compl. 4, ECF No. 1.

The day after the break in, Jordan installed a home security system. On March 20, 2017, he received a notification on his cell phone of movement detected by his rear home security camera. The camera captured video of a white male he believes was Flippin, leaving from under the carport.

On May 12, 2017, while Jordan and Amany were on a trip to Aruba, both received cell phone notifications from the home security system. The camera feed showed that at 2:12 p.m., three white males (Flippin, Virginia State Trooper Joseph Crowder, and another unknown to Jordan) entered Jordan's property from the wooded area to the side of the building, retrieved GPS devices from two vehicles, installed a GPS device on another vehicle, and left through the woods. A few minutes later, the security system notified Jordan and Amany of motion near the home. This time, the feed showed the same three men reenter the property. At 2:22 p.m., the home security alarm was activated. On the visual and audio feed from a security camera, Jordan saw and heard Crowder asking the others, "What the hell is that noise? and directing them to Turn that shit off." Jordan Aff. ¶ 6, ECF No. 1-3. At that point, the internet connection to the home security system stopped "because of the obvious officers' disconnection of [Jordan's] internet." *Id.*

Jordan called a friend, Antoine Hash, to drive by the residence to see what the officers were doing. Hash reported arriving at 2:41 p.m. to see Flippin and another man leave the front door area of the residence. Flippin took a cell phone from his pocket and took a picture of Hash before he and the other man ran into the woods. Hash did not see a third man. At 2:48 p.m., Jordan's internet connection was restored and the feed from the security cameras began working again.

On August 10, 2017, state and federal law enforcement authorities arrested Jordan in Bedford County. Crowder drove Jordan to the Roanoke City Jail and engaged him in conversation. He said Jordan had been under 24-hour surveillance for months, even during a trip to Mexico, and that authorities were "going after" Amany. *Id.* at ¶ 7. Crowder asked, "Did Amany get her dual-citizenship problem fixed?" *Id.* Jordan believes that Crowder could only have learned this information from the documents in the backpack that were disturbed during the break in on March 6, 2017.

In March of 2019, Jordan filed this civil rights action under § 1983 and *Bivens* against Flippin, Sloan, and Crowder, seeking monetary damages for violations of his constitutional rights and Virginia tort laws.² Specifically, Jordan asserts that the

---

² The Virginia laws Jordan cites, Compl. 5-6, ECF No. 1, are criminal statutes for burglary, grand larceny, injuring property, conspiracy to commit a felony, and conspiracy to trespass or commit larceny. Private citizens have no right to prosecute or obtain prosecution of state law crimes against another person, whether through a civil rights action or by any other means. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (citizens

officers entered his property and residence on March 6, 2017, without probable cause or a search warrant, damaged his basement door, tampered with personal documents and clothing, and took valuables and cash. He also asserts that on May 12, 2017, Flippin, Crowder, and an unknown official entered his property lawfully for purposes of checking or planting court-authorized GPS devices, but then later trespassed on the property for no lawful reason and disconnected his cable and internet service. Jordan asserts that these actions violated his Fourth Amendment right to be free from unreasonable searches and seizures and deprived him of property without due process, in violation of the Fourteenth Amendment.

Flippin has filed Motions to Dismiss, to which Jordan has responded. Sloan and Crowder, in response to Jordan's claims, have indicated that they are both task force officers for the DEA. They have filed Motions to Dismiss, to which Jordan has responded. I construed one of Jordan's responses, ECF No. 49, as amending his case to recast his tort claims against Sloan and Crowder as claims under the Federal Tort Claims Act ("FTCA") against the United States. The United States as a defendant has also filed a Motion to Dismiss, to which Jordan has responded.

---

have no "judicially cognizable interest in the prosecution or nonprosecution of another"). Nevertheless, I liberally construe Jordan's Complaint as asserting common law tort claims such as civil trespass, conversion, civil conspiracy, and invasion of privacy against Flippin and against the United States pursuant to the FTCA.

II.

A. Motion to Dismiss by the United States.

The United States has moved to dismiss Jordan's FTCA claims under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter, based on his admitted failure to comply with the FTCA's mandatory exhaustion requirement before filing this lawsuit.[3] I conclude that the motion must be granted.

Subject matter jurisdiction is a threshold issue, and the Court must address it before reaching the merits of the case. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–102 (1998). Jordan, as the party asserting federal jurisdiction, bears the burden of proving jurisdiction. *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). A district court should grant a Rule 12(b)(1) motion to dismiss "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* at 768.

The FTCA clearly provides that, before bringing an action against the United States, a claimant "shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing." 28

---

[3] I previously ruled that Jordan converted his tort claims against Crowder and Sloan to FTCA claims against the United States. To the extent that he also intended to pursue separate tort claims against these officers, the FTCA expressly immunizes them from liability for the torts they allegedly committed within the scope of their employment. *See* 28 U.S.C. § 2679(b)(1)–(2).

U.S.C. § 2675(a). It is well-settled that the requirement of filing an administrative claim before filing suit is jurisdictional and may not be waived. *Kielwien v. United States*, 540 F.2d 676, 679 (4th Cir. 1976). Specifically, the claimant must present his claim to the relevant federal agency in "an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death." 28 C.F.R. § 14.2(a).

It is undisputed that Jordan did not file a tort claim with the DEA concerning the allegations against Sloan and Crowder before filing this lawsuit. Instead, he pursued an officer misconduct complaint with the Office of the Inspector General in Washington, D.C., that triggered a lengthy investigation. Jordan states that once the investigation is completed, he "intend[s] to promptly file the required administrative remedies." *See* Resp. Opp'n Mot. Dismiss Ex. A, Jordan Aff. ¶ 7, ECF No. 67-1. Because Jordan filed this lawsuit before completing the exhaustion process, however, the court has no jurisdiction to address his FTCA claims in this case. Accordingly, I will dismiss all such claims.

B. Motions to Dismiss under Rule 12(b)(6).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added).[4]  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.*

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the *reasonable* inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Id.* (emphasis added).

While the court must accept factual allegations of the complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* To determine whether a complaint states a plausible claim for relief so as to survive a motion to dismiss, the court must undergo "a context-specific task," engaging "its judicial experience and common sense," regarding what inferences are reasonably drawn from the plaintiff's facts.  *Id.* at 679.  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

---

[4] I have omitted internal quotation marks, alterations, and/or citation(s) throughout this Opinion, unless otherwise noted.

complaint has alleged — but it has not 'shown' — 'that the pleader is entitled to relief' and cannot survive a motion to dismiss." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)); "*Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013) ("The plausibility standard requires a plaintiff to demonstrate more than a sheer *possibility* that a defendant has acted unlawfully.") (emphasis added). Thus, "a plaintiff armed with nothing more than conclusions" has not "unlock[ed] the doors of discovery" through which to fish for the missing elements of his claim. *Iqbal*, 556 U.S. at 678–79.

To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). To hold an official liable under § 1983, the plaintiff must state facts affirmatively showing that the officer acted personally to deprive the plaintiff of, or violate his, constitutional rights. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). *Bivens* provides an implied remedy against federal officials for damages to remedy a constitutional violation. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017). In a *Bivens* complaint, as in a § 1983 complaint, a plaintiff must present facts showing that each government-official defendant, "through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

I have an obligation to construe pro se pleadings liberally, so that any potentially valid claim can be fairly decided on its merits rather than the pro se litigant's legal acumen. *See Covey v. Assessor of Ohio Cty.*, 777 F.3d 186, 194 (4th Cir. 2015). Still, a pro se plaintiff must "allege *facts* that state a cause of action." *Considder v. Medicare*, No. 3:09CV00049, 2009 WL 9052195, at *1 (W.D. Va. Aug. 3, 2009).

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The central intention of this amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019). An officer's search of a citizen's home conducted without a warrant issued by a neutral magistrate after a showing of probable cause is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). On the other hand, "just as private citizens may approach a home, absent contrary instructions from the owner, to knock on a door, so may the police approach without probable cause, a warrant, or exigency." *Rogers v. Pendleton*, 249 F.3d 279, 289 (4th Cir. 2001).

The defendants argue that Jordan fails to allege enough factual matter to state a plausible claim that they violated his Fourth Amendment rights. I agree.

Jordan's claim that officers burgled his residence on March 6, 2017, rests on bare assertions, with no facts he could offer from personal knowledge to support them: "Flippin, Crowder and Sloan walked through the wooded area on the side of the residence," "knocked a hole in the rear door window," "forcibly dislodged the rear door and entered [Jordan's] home," "searched the basement area, the kitchen and both upstairs bedrooms," all "without a warrant [and] destroyed and stole property therefrom." Compl. 3, 7, ECF No. 1. Neither Jordan nor any witness he has identified saw the officers approach or enter his home that day. He asserts that the pole camera the officers had earlier installed would not have filmed their actions on the side of the residence or in the rooms that were disturbed. He alleges no facts indicating that items taken from the residence are now in the possession of these officers or any law enforcement agency.

Jordan did not file a report to police about the break in, based on his "suspicion" that law enforcement officials were involved. *Id.* at 4. Now, he contends that the fact finder should accept as fact his mere suspicion that the officers committed the burglary by drawing inferences from his other facts: the man who talked to Jordan about internet repairs on January 30, 2017, around the time the pole camera was apparently installed; the man (whom Jordan later identified as Sloan) who came to check gutters on March 3, 2017, and briefly reentered Jordan's residence without consent; the man (whom Jordan later identified as Flippin) who

sat in the pickup across the street from Jordan's residence on March 6, 2017; security camera footage from two months later showing Flippin and Crowder entering Jordan's property from the woods to the side of the building to check GPS devices; and Crowder's unexplained knowledge of Amany's dual-citizenship problem. Because the Complaint pleads facts that are, at the most, merely consistent with the defendants' liability for the burglary, "it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678. The only facts before me "do not permit [me] to infer more than the mere possibility of misconduct," and thus, Jordan's submissions have only "alleged — but [they have] not shown — that the pleader is entitled to relief." *Id.* at 679. Accordingly, I conclude that Jordan's allegations concerning a purported unlawful search and seizure by the defendants on March 6, 2017, fail to state a plausible Fourth Amendment claim and must be dismissed.

Similarly, Jordan's claim concerning events on May 12, 2017, is constructed of bald, conclusory assertions, suspicions, and unwarranted leaps of logic. He asserts that

> Crowder and Flippin [were] observed on [Jordan's] property to retrieve and install GPS device[s]. However afterwards defendants remained on [his] property for 45 additional minutes. During this time [his] home alarm was triggered and defendants Flippin and Crowder disarmed [his] home surveillance by disconnecting the cable connection.

Compl. 4-5, ECF No. 1. Jordan himself was not present on the scene that day. It is undisputed that the officers obtained warrants to plant and check GPS devices, thus meeting their Fourth Amendment obligations for lawful entry of his property. Jordan has not alleged that his security camera recording shows, or that his friend Hash witnessed, Crowder, Flippin, or any other officer actually handling Jordan's home surveillance devices or his internet cable connection on May 12, 2017, before or after the 20-minute period when the security system allegedly ceased functioning. Moreover, Jordan alleges that the officers were no longer present when the internet connection and security system resumed normal functioning. The facts Jordan presents simply cannot support reasonable inferences to state a plausible claim that Crowder and Flippen committed any violation of Jordan's Fourth Amendment rights on that date.[5] Accordingly, his federal claims concerning events on May 12, 2017, must be dismissed.[6]

---

[5] Jordan's Complaint also contends that the defendants' alleged actions deprived him of property interests without due process, in violation of the Fourteenth Amendment. Compl. 7, ECF No. 1. Apparently, the property interests at issue here are the items taken from Jordan's home on March 6, 2017, and perhaps the internet service interruption on May 12, 2017. I have concluded, however, that Jordan's Complaint does not provide sufficient factual matter to support any plausible claim that the defendants entered his home, took property items, or handled his internet cable on these dates. Based on that finding, Jordan fails to state a claim that the defendants deprived him of property without due process.

[6] Jordan's state law tort claims against defendant Flippin are not independently actionable under § 1983. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). While I could exercise supplemental jurisdiction over them, I decline to do so because I am dismissing all of his federal claims. *See* 28 U.S.C. § 1367(c).

III.

For the reasons stated, I will grant the defendants' Motions to Dismiss as to Jordan's federal claims and dismiss his state law tort claims without prejudice.

An appropriate Order will enter herewith.

ENTER: March 6, 2020

/s/ JAMES P. JONES
United States District Judge